UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| CONSERVATION LAW FOUNDATION, INC.   ) | |
| ) | Case No. 1:20-cv-10035-MBB |
| Plaintiff,                                               ) | |
| ) | |
| v.                                                           ) | |
| ) | |
| PAUL REVERE TRANSPORTATION, LLC., and ) | |
| ALTERNATE CONCEPTS, INC.               ) | |
| ) | |
| Defendants.                                         ) | |
| _____) | |

**<u>CONSENT DECREE</u>**

WHEREAS, Plaintiff Conservation Law Foundation ("CLF" or "Plaintiff") filed this

action on January 9, 2020 against Paul Revere Transportation, LLC and Alternate Concepts, Inc.

(collectively "PRT and ACI" or "Defendants");

WHEREAS, Plaintiff is a non-profit environmental organization incorporated in

Massachusetts;

WHEREAS, Defendants are transportation companies operating in the Commonwealth of

Massachusetts;

WHEREAS, Plaintiff alleges in its complaint that Defendants idled motor vehicles in

violation of the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* ("CAA" or "Act") and the

Massachusetts motor vehicle idling requirements contained within the federally enforceable

Massachusetts State Implementation Plan ("SIP"), 310 C.M.R. § 7.11(1)(b) and sought civil

penalties, injunctive relief, and Plaintiff's attorneys' fees and costs of litigation;

WHEREAS, Plaintiff and Defendants (collectively the "Parties") have negotiated this

Consent Decree in good faith and at arm's length, and agree that the settlement of the above-

1

captioned action (the "Action") through this Consent Decree without further litigation is in the public interest, and is a fair, reasonable, and appropriate means of resolving all claims in the Action;

WHEREAS, the Parties anticipate that this Consent Decree will enhance public health and the environment by improving air quality in Massachusetts;

WHEREAS, the Plaintiff and Defendants each consent to the entry of this Consent Decree without further trial, argument, or appeal;

WHEREAS, pursuant to 42 U.S.C. § 7604(c)(3), this Consent Decree is being forwarded to the United States Department of Justice and to the United States Environmental Protection Agency ("EPA") for the forty-five (45) day review period mandated by the CAA;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), below, and with the consent of the Parties,

IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action, the subject matter herein, and over the Parties consenting hereto, pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331.

2.    Venue properly lies in this Court and district pursuant to 42 U.S.C. § 7604(c)(1) and 28 U.S.C. § 1391(b), because the Complaint alleges violations to have occurred in this district, and the Defendants conduct business in this district.

3.    Plaintiff gave Defendants notice by a letter (the "Notice Letter") of the violations alleged in the Complaint more than sixty (60) days prior to commencement of this lawsuit. Copies of the Notice Letter were also mailed to the Administrator of the EPA, the Regional

Administrator of the EPA for Region 1, the Massachusetts Department of Environmental Protection ("MassDEP") Commissioner, and the EPA Citizen Suit Coordinator. Neither EPA nor MassDEP commenced any action prior to Plaintiff's filing of the Complaint.

4.      Solely for the purposes of this Consent Decree and the underlying Complaint, and any action to enforce this Consent Decree, Defendants consent to this Court's jurisdiction and to venue in this judicial district. Defendants consent to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree. Except as expressly provided for herein, this Consent Decree shall not directly create any rights in or obligations of any Party other than the Parties to this Consent Decree.

5.      This Court shall retain jurisdiction over this case until the Termination Date for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections XI (Dispute Resolution) and XV (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

## II.      APPLICABILITY

6.      Upon the Effective Date, the obligations of this Consent Decree shall apply to, and be binding upon, Plaintiff and Defendants, and any successors, assigns, or other entities or persons otherwise bound by law.

7.      In any action to enforce this Consent Decree, Defendants shall not raise as a defense the failure by any of its officers, directors, employees, or agents to take any actions necessary to comply with the provisions of this Consent Decree.

## III.      DEFINITIONS

8.      Terms used in this Consent Decree that are defined in the CAA or in regulations promulgated by EPA and MassDEP pursuant to the Act shall have the meanings assigned to

them in the Act or such regulations, unless otherwise provided in this Consent Decree. All references to a duration of "days" shall be calendar days unless otherwise specified. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a. "Air Pollution Mitigation Projects": Projects that will reduce air pollution and improve the environment in Boston, particularly in the neighborhoods where PRT operates bus lots and runs its bus routes. These projects will be implemented pursuant to the terms provided in Exhibit A.

b. "Effective Date": The date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket.

c. "Implementing Organization": Each of the third-party entities implementing the Air Pollution Mitigation Projects described in Exhibit A of this Consent Decree.

d. "Independent Auditor": A mutually selected independent third party, retained pursuant to the Independent Auditor Agreement.

e. "Independent Auditor Agreement": Enforceable private contract between the Parties and the Independent Auditor governing the retention, duties, reporting, and payment of the Independent Auditor.

f. "Progressive Discipline Policy": Paul Revere's disciplinary process for operators in accordance with its Collective Bargaining Agreements with the Teamsters Local Union No. 25.

g. "GPS System":  GPS-based dispatch alert and anti-idling tracking system, either developed by Spireon or a similar proven technology provider.

h.    "Termination Date": The date on which the Consent Decree term ends. Five years after the Effective Date pursuant to Section XIV (Effective Date and Termination).

## IV.    COMPLIANCE MEASURES

A.    Signage & Training

9.    Vehicles operated by PRT in Massachusetts shall comply with the Massachusetts idling regulation, 310 C.M.R. § 7.11(1)(b), which compliance shall be determined by the Idling Policy set forth under separate agreement between the Parties.

10.    PRT shall post and maintain clearly visible "No Idling as Defined Under 310 CMR 7.11(1)(b)" signs at all Paul Revere-operated transportation lots. On these signs, "No Idling" shall be printed in large font, and "as Defined Under 310 CMR 7.11(1)(b)" shall be printed in smaller font.

11.    PRT shall post and maintain clearly visible "No Idling" stickers on the dashboard of each Paul Revere-operated bus.

12.    PRT shall address the below topics in the idling trainings provided pursuant to ¶¶ 13, 14, and 17 (trainings for newly hired or rehired drivers, annual trainings, and trainings for noncompliant drivers):

a.    Idling regulations, including the Parties' agreed-upon interpretation of 310 C.M.R. § 7.11(1)(b), as memorialized in the Idling Policy;

b.    Strategies for avoiding idling, including avoiding unnecessary idling during pre- and post-trip inspections, loading and unloading passengers, and excessive heating or cooling during extreme weather;

c.    The negative health effects of idling; and

      d.      The incentives offered by PRT to drivers to encourage compliance with the Idling Policy.

13. PRT shall require all newly hired or re-hired drivers to be trained on the Idling Policy within 30 days of hiring.

14. The training on the Idling Policy for the newly hired or re-hired drivers and the annual training for all drivers shall be at least fifteen minutes in length.

15. PRT shall deliver training materials as a pamphlet or bus operator handbook insert. Idling Policy materials shall be made available to drivers upon request.

16. PRT shall include at least one anti-idling message per week during safety briefings or other operator communications.

17. PRT shall require drivers who do not comply with the Idling Policy to attend additional idling trainings and be monitored for compliance for at least one week following the noncompliance. PRT shall subject drivers who do not comply with the Idling Policy to the Progressive Discipline Policy.

18. PRT shall comply with the signage and training measures listed in Paragraphs 9-17 within 30 days of the Effective Date of the Consent Decree. PRT shall comply with Paragraphs 9-17 until the Termination Date and may continue these measures indefinitely.

B.      Diesel Emission Reduction and Technology Systems

19. Within six months after the Effective Date of this Consent Decree, PRT shall install and begin operating the GPS System in all the nonelectric buses which they own and which are in service.

20. The GPS System shall alert a PRT dispatcher or manager if any GPS System-equipped vehicle has been idling for five minutes. Following an alert of idling by the GPS

System, the dispatcher or manager will determine if the driver is in violation of the Idling Policy, and if so, will instruct the driver of the idling vehicle to turn off the engine. The driver shall restart the engine only after: 1) they have contacted the dispatcher, and 2) they are ready to initiate the movement of the vehicle, the pre-trip and post-trip inspections, or active loading/unloading of passengers.

21.     PRT shall install in each of their buses an automatic shut-off mechanism no later than six (6) months after the Effective Date of this Consent Decree. For each bus in their fleet, PRT shall set this mechanism to turn off the engine after five (5) minutes of idling, excluding time for active loading/unloading of passengers, to complete a pre-trip or post-trip inspection, or other exceptions listed in Section II.E of the agreed Audit Scope.

22.     PRT shall maintain the active or passive diesel particulate filters ("DPF") currently installed on each of their diesel transit buses measuring 40 feet or longer. PRT shall install and maintain active or passive DPFs on any new diesel transit buses measuring 40 feet or longer which they acquire.

23.     PRT shall continue to use Diesel Emissions Fluid ("DEF") in their diesel transit buses measuring 40 feet or longer.

24.     PRT shall continue to use ultra-low sulfur diesel in its diesel transit buses measuring 40 feet or longer.

25.     PRT shall install and maintain active or passive DPFs on each of their diesel buses that are currently without DPFs within one year of the Effective Date of this Consent Decree.

26.     PRT shall comply with the diesel emission reduction and technology systems measures listed in Paragraphs 19-25 until the Termination Date and may continue these measures indefinitely.

C.     Encouragement of Transition to Electric Vehicles

27.     For each Request for Proposal that PRT responds to, both for new contracts and renewals of existing contracts, PRT shall include electric vehicle proposals. Electric vehicle proposals include those which include varying percentages of the vehicle fleet to be comprised of electric vehicles. PRT shall include with their electric vehicle proposals literature which includes the economic, environmental, and health benefits of electric vehicles.

28.     PRT shall comply with the electric vehicle proposals provision listed in Paragraph 27 within 30 days of the Effective Date of the Consent Decree. PRT shall comply with Paragraph 27 until the Termination Date and may continue this measure indefinitely.

## V.     COMPLIANCE MONITORING MEASURES

A.     Idling Enforcement

29.     PRT shall assign four instructors (the "Instructors") to monitor the drivers' compliance with the Idling Policy at PRT bus lots as well as any locations where buses stop for longer than five minutes on their route. These locations shall include the following locations, all of which are located in Boston, Massachusetts: the bus lots at 59 Reading Street, 84 Hampden Street, and 123 Eastern Ave, as well as at the Ruggles Longwood Medical and Academic Area ("LMA") Shuttle Stop and at the EZRide Shuttle Stop at North Station.

30.     The Instructors shall conduct unannounced walkthroughs multiple times per week in the bus lots at 59 Reading Street, 84 Hampden Street, and 123 Eastern Ave during the morning and afternoon pull-out periods.

31.     The Instructors shall conduct unannounced checks of buses multiple times per week at any location where buses routinely stop for longer than five minutes, including at the Ruggles LMA Shuttle Stop and at the EZRide Shuttle Stop at North Station.

32.     The Instructors who witness idling in violation of the Idling Policy shall immediately tell drivers to turn off their engines and explain the Idling Policy.

33.     Instructors and supervisors employed by PRT shall shut off the engine of any vehicle owned and/or operated by PRT found idling in violation of the Idling Policy where the operator is absent from the bus.

34.     The Instructors shall identify and document drivers who idle in violation of the Idling Policy and the violation.

35.     PRT shall train the participants in its "Mystery Riders Program" [1] to monitor compliance with its Idling Policy and to immediately report noncompliance to the dispatchers.

36.     PRT shall comply with the idling enforcement measures listed in Paragraphs 29-35 within 30 days of the Effective Date of the Consent Decree. PRT shall comply with Paragraphs 29-35 until the Termination Date and may continue these measures indefinitely.

B.     Interventions and Incentives for Drivers

37.     Defendants shall maintain documentation of unnecessary idling and create metrics to identify drivers who are idling in violation of the Idling Policy. Drivers who violate the Idling Policy shall be disciplined in accordance with the Progressive Discipline Policy, shall be reinstructed, and shall be supervised or monitored for compliance (see *supra* at ¶ 17).

---

[1] Mystery Riders are responsible for evaluating the safe operation of Paul Revere Transportation transit buses and compliance of all traffic regulations and Paul Revere policies and procedures, including the Idling Policy. Mystery Rider employees are expected to maintain a professional image, emphasizing positive customer relations, and must have the ability to sit for extended periods of time and to remain discreet and anonymous from Paul Revere Transportation's bus operators.

38.     PRT shall create and maintain an incentive program to reward drivers who comply with the Idling Policy. The incentive program shall be team-based. If the operators in a shift do not have any violations of the Idling Policy, at the end of the month they will receive recognition. Individual drivers who do not have any violations of the Idling Policy at the end of the year will receive recognition.

39.     PRT shall comply with the measures listed in Paragraphs 37-38 within 30 days of the Effective Date of the Consent Decree. PRT shall continue to comply with Paragraphs 37-38 until the Termination Date and may continue these measures indefinitely.

C.     Audits

40.     The Parties shall enter into the Independent Auditor Agreement after the Effective Date. Any disputes concerning the Independent Auditor and any reports issued by the Independent Auditor shall be resolved pursuant to Section XI (Dispute Resolution) of the Consent Decree.

41.     PRT shall pay for an independent qualified auditor, mutually agreeable to the Parties as set forth in the Independent Auditor Agreement, who will conduct quarterly audits (totaling up to 20 times over the course of this Consent Decree) at PRT lots and at locations where buses stop for more than five minutes (including the bus lots at 59 Reading Street, 84 Hampden Street, and 123 Eastern Ave, as well as at the Ruggles LMA Shuttle Stop and at North Station).

42.     If the quarterly audits determine full compliance after two years (i.e. eight audits), the remaining audits will occur on a semi-annual basis for the duration of the Consent Decree (i.e. six remaining audits).

## VI.   RECORDKEEPING AND REPORTING

43.     PRT shall submit Compliance Reports to CLF twice per year until the Termination Date. Defendants shall submit the final Compliance Report pursuant to Paragraph 80 *infra*.

44.     The Compliance Reports shall include summaries of all disciplinary actions taken against drivers who were found to have violated PRT's idling policy and the remedies implemented to correct any instances of unnecessary idling. Each Compliance Report, except the final Compliance Report, shall include information regarding the prior six-month period and shall be submitted within 45 days of the last day of that six-month period. The final Compliance Report shall include information regarding the last six-month period of the Consent Decree term and shall be submitted by the Termination Date. The Compliance Reports shall not include any confidential employee information.

45.     The Compliance Reports shall be maintained confidentially by the Parties and shall not be admissible as evidence in any pending or future litigation or administrative proceeding except as necessary to enforce this Consent Decree and subject to the redaction requirements on the Public Access to Court Electronic Records ("PACER") service.

46.     PRT shall maintain records of violations of the Idling Policy observed and documented by the Instructors during walkthroughs as described in Paragraphs 30, 31 and 34 or by supervisors. PRT or Defendants' counsel shall provide records of violations of the Idling Policy to CLF twice per year upon request, with the requested data to cover the preceding six months.

47.     PRT shall send ten (10) semi-annual Compliance Reports to CLF as follows. The first Compliance Report shall cover the period from the Effective Date until six months

following the Effective Date and shall be submitted within 45 days of the last day of that six-month period. The second Compliance Report shall be submitted within 45 days of the first anniversary of the Effective Date. Subsequent reports shall be submitted annually on the anniversary of those two dates.

### VII.    PAYMENTS

A.    Civil Penalty

48.    Within forty-five (45) days of the Effective Date, Defendants shall pay to the United States Department of Treasury a civil penalty of $10,000. Failure to timely send payment of the civil penalty to the United States Department of Treasury shall subject Defendants to interest accruing from the date payment is due until the date payment is sent at the rate prescribed by 28 U.S.C. § 1961 and shall render Defendants liable for all charges, costs, fees, and penalties established by law for the benefit of a creditor or of the United States in securing payment.

B.    Air Pollution Mitigation Projects

49.    Defendants shall pay a total of $585,000 to fund Air Pollution Mitigation Projects pursuant to the terms provided in Exhibit A. The $585,000 shall be distributed to the following recipients on the following schedule:

    a.    One payment of $100,000 to Urban Farming Institute ("UFI") and one payment of $85,000 to Boston Farms Community Land Trust ("Boston Farms"), on or before 90 days following the Effective Date.

    b.    One payment of $100,000 to UFI and one payment of $100,000 to Boston Farms, on or before within one year of the payment deadline in Paragraph 49a.

  c.  One payment of $100,000 to UFI and one payment of $100,000 to Boston Farms, on or before within two years of the payment deadline in Paragraph 49a.

50. Defendants shall not deduct any penalties paid under Section VII (Payments) or Section VIII (Stipulated Penalties) in calculating its federal, state, or local income tax.

51. Each Implementing Organization will submit to the Parties, pursuant to the notice provision in Section XIII (Notices), annual status reports due each year on the anniversary of the payment deadline in Paragraph 49a while funds are being spent. The status reports will include, at a minimum, the following information: (i) description of activities completed to date and related expenditures of Project Funds and (ii) a discussion of any anticipated changes to the scope or timeline of the Mitigation Projects.

C. Emissions Reduction Project

52. Defendants shall spend, regardless of whether through financing, an aggregate amount of $400,000 before the termination of the Consent Decree to promote a transition toward zero emission vehicles (the "Emissions Reduction Project").

53. The Emissions Reduction Project shall consist of the expenditure of $400,000 to purchase a minimum of five (5) fully electric zero emission vehicles for supervisors, such as vans or SUVs, and the installation, maintenance, and usage of supporting electric charging station infrastructure. PRT supervisors will use the five fully electric zero emission vehicles for all work travel requirements. Electric charging station infrastructure expenditures may include any investments that will promote a transition toward zero emission vehicles, including but not limited to:

  a.  The purchase, installation, maintenance, and usage of electric vehicle

13

charging station infrastructure with plugs at Defendants' 59 Reading Street lot in Roxbury;

b. Fees and costs associated with necessary electricity and infrastructure upgrades to accommodate charging stations and electric vehicles at Defendants' 59 Reading Street lot in Roxbury; and

c. The purchase of additional compatible zero emission vehicles.

54. The $400,000 aggregate total shall be the minimum amount invested in the Emissions Reduction Project, notwithstanding the invoiced value of items secured by loans and/or capital leases and shall be expended and accounted for before the termination of the Consent Decree.

55. The $400,000 that shall be devoted to the Emissions Reduction Project may only be used for Defendants' transition to electric vehicles that would not have occurred or would not have occurred in the timeframe required under the Consent Decree, but for the settlement of this enforcement action.

56. Consistent with Paragraph 54, Defendants shall retain and produce documentation of the expenditures listed in Paragraphs 53 including vendor invoices and vehicle registrations.

57. Defendants shall submit to CLF a written report within five (5) years of the Effective Date describing the status of the Emissions Reduction Project and attaching documentation of the purchases made. Such documentation shall include invoices, receipts, and/or any other documents necessary to demonstrate that Defendants have expended at least $400,000 on purchases made pursuant to the Emissions Reduction Project.

D. Costs of Litigation

58. Consistent with 42 U.S.C. § 7604(d), within forty-five (45) days of the Effective

14

Date, Defendants shall pay $120,000 by company check to Plaintiff, which shall resolve all claims for attorneys' fees, costs of litigation, or other expenses.

59.    In the event that any payment of attorneys' fees and costs of litigation owed by Defendants under Paragraph 58 are not made on or before the due date, Plaintiff shall provide written notice to Defendants of such failure to pay on or by the due date. Defendants shall have ten (10) business days from the date of Plaintiff's notice to make payment.

## VIII.    STIPULATED PENALTIES

60.    Defendants shall be liable for stipulated penalties following non-compliance with the Idling Policy as observed by the Independent Auditor for each vehicle and each occurrence of violation of the Idling Policy as determined by the Independent Auditor Agreement.

61.    The accrual, payment, and dispute of stipulated penalties for violations of the Idling Policy shall be solely governed by this Section, the dispute resolution procedures set forth below in Section XI (Dispute Resolution), and the Independent Auditor Agreement.

62.    Stipulated penalties are to be issued pursuant to the protocol set forth in the Independent Auditor Agreement as follows:

    a.    $150 per vehicle per occurrence of 1 to 10 minutes of idling not in compliance with the Idling Policy and in excess of 5 minutes.

    b.    $300 per vehicle per occurrence of 11 to 20 minutes of idling not in compliance with the Idling Policy and in excess of 5 minutes.

    c.    $2,000 per vehicle per occurrence of 21 to 40 minutes of idling not in compliance with the Idling Policy and in excess of 5 minutes.

    d.    $3,000 per vehicle per occurrence of 41 to 60 minutes of idling not in compliance with the Idling Policy and in excess of 5 minutes.

e.   $6,000 per vehicle per occurrence of more than 60 minutes of idling not in compliance with the Idling Policy and in excess of 5 minutes.

63.   If Defendants do not invoke the Corrective Action Notice ("CAN") Procedure described in the Independent Auditor Agreement, Defendants shall pay stipulated penalties for violations of the Idling Policy to the Implementing Organizations within 30 days of each report of idling not in compliance with the Idling Policy.

64.   All stipulated penalties shall be distributed to the Implementing Organizations equally. For example, if stipulated payments of $3,000 are due, Defendants shall pay $1,500 to UFI and $1,500 to Boston Farms.

## IX.   PUBLICITY

65.   Any public statement made by Defendants in any press release, in any oral or written material promoting Defendants' environmental or charitable practices or record, or in Defendants' Annual Reports, that refers to Defendants' payments or other financial obligations under Section VII (Payments) and Section VIII (Stipulated Penalties), shall include the following language or language materially similar to the following: "Purchases were made pursuant to the settlement of a Clean Air Act lawsuit brought by Conservation Law Foundation" or "Payments to the organizations were made pursuant to the settlement of a Clean Air Act lawsuit brought by Conservation Law Foundation."

66.   Each Party shall be offered a reasonable opportunity to review and comment on any press release, article, and website update (excluding social media posts) issued by a Party and related to the lawsuit, the Independent Auditor Agreement, the Emissions Reduction Project, or the Consent Decree, as early as practicable prior to its release.

### X.     FORCE MAJEURE

67.     "Force majeure," for purposes of the Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors, that delays or prevents the performance of any obligation under the Consent Decree despite Defendants' best efforts to fulfill the obligation. Force Majeure events shall include, but are not limited to: war or violent uprisings, natural disasters, labor strikes, transport delays, civil unrest, a declared state of emergency, any public health concerns (which shall include without limitation the COVID-19 pandemic), and shortages impacting the zero emissions vehicle, or electric vehicle charging markets that are beyond Defendant's control and render Defendant unable to secure equipment, supplies, or other materials as part of the Emissions Reduction Project described in Part VII.C. An increase in costs, a change in financial circumstances, or Defendants' economic inability to comply are not Force Majeure events.

68.     If any event occurs that causes or may cause delay in the performance of any obligation under the Consent Decree, Defendants shall notify Plaintiff as soon as practicable but no later than thirty (30) days of the date on which Defendants became aware of the potential delay. Upon notification, Plaintiff shall have the right to request all necessary documentation explaining the potential delay. If requested, Defendants shall have ten working days from the date of the request to provide the documentation. Upon providing notice of Force Majeure, Defendant's time for performance of the obligations under this Consent Decree that are affected by the Force Majeure will be extended as necessary to complete those obligations, or the obligations will be eliminated if performance is no longer possible.

## XI.   DISPUTE RESOLUTION

69.     All disputes related to Section VIII (Stipulated Penalties) and the Independent Auditor Reports shall be resolved pursuant to the CAN Procedure described in the Independent Auditor Agreement. Disputes which cannot be resolved by the CAN Procedure will be brought before this Court for resolution.

70.     Disputes which cannot be resolved by the CAN Procedure will be discussed, in good faith, between the parties prior to either party seeking court intervention. This good faith discussion shall include the party contemplating court intervention providing an advance copy of all documents the party intends to file with the court to the other party at least 10 days prior to the filing of said document(s) with the court. Upon review of such advance copy or copies, the parties shall, in good faith, meet via Zoom, phone or in person to attempt to both narrow and resolve any disputes. Only if this discussion does not resolve such disputes may the initiating party proceed to file such document(s) with the court.

71.     The Court shall retain jurisdiction over this case until the Termination Date to enforce the terms and conditions of the Consent Decree, to modify the Consent Decree, and to resolve any disputes arising hereunder, except as set forth in Paragraph 69.

## XII.   EFFECT OF SETTLEMENT

72.     Defendants do not admit any liability arising out of or related to the allegations set forth in Plaintiff's Complaint.

73.     Entry of the Consent Decree shall resolve any and all claims, causes of action, or liability arising under the CAA and Massachusetts state law brought by the Plaintiff against the Defendants for damages, penalties, fines, injunctive relief, past and future attorneys' fees, past and future costs, or any other claim or relief relating to the violations that were alleged, or could

have been alleged, in the Complaint or in this action; Plaintiff covenants not to sue, releases, and forever discharges Defendants from all such claims, causes of action, or liabilities arising on or before the Effective Date.

74.    CLF covenants not to sue and shall not bring any claim, cause of action, or suit against Defendants for any alleged violations of the same nature or type as those described in the Complaint that occur prior to the Termination Date; Plaintiff's exclusive remedy and recourse for any such claims against Defendants, or other claims related to violations of the Defendants' idling policy or alleged violations of Massachusetts idling laws or regulations arising after the Effective Date and prior to the Termination Date shall be through the stipulated penalties described in the Consent Decree, subject to the outcome of any dispute resolution process.

75.    The Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to the Consent Decree.

## XIII.  NOTICES

76.    Unless otherwise provided herein, whenever notifications, submissions, or communications are required by the Consent Decree, they shall be made in writing and addressed as follows:

For Plaintiff:
Clean Air and Water Paralegal
Esther Ritchin
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
eritchin@clf.org

For Defendants:
Scott Andrews
Paul Revere Transportation, LLC
100 Eastern Avenue
Chelsea, MA 02150
sandrews@prtbus.com

Patrick Aufiero
Alternate Concepts, Inc.
One Liberty Square, Suite 430
Boston, MA 02109
paufiero@aciboston.com

Michael Hayden
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210
mhayden@morrisonmahoney.com

77.    Any Party may, by written notice to the other Party, change its designated notice recipient, address, or means of transmittal provided above.

78.    All notifications, communications, or submissions made pursuant to this Section shall be sent by electronic mail. Any Party planning a communication by non-electronic means should first attempt to contact the opposing Party to confirm the appropriate mailing address.

## XIV.    EFFECTIVE DATE & TERMINATION

79.    The Effective Date of the Consent Decree shall be the date upon which the Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket (the "Effective Date"). All obligations arising under the Consent Decree shall become effective as of the Effective Date.

80.    The Consent Decree shall terminate five years after the Effective Date on the "Termination Date". Defendants shall not be required to produce any data or information regarding anything beyond the Termination Date.

## XV.    MODIFICATION

81.    The terms of the Consent Decree may be modified only by a subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of the Consent Decree, it shall be effective only upon approval by the Court.

## XVI.   SIGNATORIES/SERVICE

82.    Each undersigned representative of the Parties certifies that they are fully authorized to enter into the terms and conditions of the Consent Decree and to execute and legally bind the Party they represent to this document.

## XVII.  INTEGRATION

83.    The Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.

## XVIII. FINAL JUDGMENT

84.    Upon approval and entry of the Consent Decree by the Court, the Consent Decree shall constitute a final judgment of the Court as to the Plaintiff and the Defendants.

## SIGNATURE PAGE

**Conservation Law Foundation, Inc.**

By: _____    Date: March 17, 2022

Heather A. Govern
Conservation Law Foundation
62 Summer Street
Boston, MA 02110

**Paul Revere Transportation, LLC**

By: _____    Date: 3.23.22

Scott Andrews
Paul Revere Transportation, LLC
100 Eastern Avenue
Chelsea, MA 02150

**Alternate Concepts, Inc.**

By: _____    Date: 3-23-22

James F. O'Leary
Alternate Concepts, Inc.
One Liberty Square
Boston, MA 02109

Dated and entered this __8th__ Day of __April__, __2022__.

Mariannne B. Bowler  , U. S. M. J.
~~United States District Court Judge~~
United States Magistrate Judge

22

**EXHIBIT A**

**AIR POLLUTION MITIGATION PROJECT DESCRIPTIONS**

**I.    Urban Farming Educational Programming and Outreach**

A.    <u>Implementing Organization</u>: Urban Farming Institute ("UFI")

B.    <u>Project Funds</u>: $300,000

C.    <u>Description</u>: This Mitigation Project will include the following components:

1.    UFI will expand urban farming throughout Boston, especially the neighborhood of Roxbury, by providing farmer training, gardening beds, and education to a variety of communities. UFI will partner with at least twenty schools to provide beds for students and teach and assist the schools and students in the practice of growing food. UFI will build more Grow Boxes in Roxbury (providing the wood, soil, bio barrier, seedlings, seeds, and raised beds) and expand their porch garden program. UFI will partner with housing developments to provide raised beds and gardening opportunities for residents of those developments. UFI will also provide raised beds for seniors and/or individuals with disabilities

2.    UFI will maintain and expand their resources for teaching members of the community how to grow food and prepare the food they've grown, creating capacity and demand for community members to participate in urban farming. UFI will maintain and expand their publicly available resources for community members to learn about and practice urban farming, including a four-week "How to Grow Food" training intensive and multiple other classes or workshops on growing and preparing food.

UFI will partner with at least twenty schools to create a curriculum that will teach students about agriculture, environment, and the history of urban farming in Boston. UFI will also launch Young Farmers teen programming to educate teenagers in Boston Public Schools on urban farming and help them promote sustainable, organic, urban, and locally grown food and work towards solving issues around food in their neighborhoods and in the world.

D.    <u>Projected Air Quality Benefits</u>: Urban agriculture can help to improve air quality through a variety of direct and indirect methods. Urban vegetation can actively clean the air, as existing air pollutants can be filtered from the air by adhering to plant surfaces and by direct absorption into the plant. Urban vegetation can help to curb pollutant emissions by providing more fresh produce grown locally in urban environments, reducing food crop transportation needs and directly resulting in a reduction of truck emissions. Urban vegetation can also create a cooling effect in the urban environment by blocking incoming solar radiation, dispersing light reflected from urban surfaces, providing shade, and releasing cooling water vapor into the atmosphere. This cooling effect reduces the need for air conditioners and other polluting cooling mechanisms, while also reducing heat-dependent, pollutant-producing chemical reactions in the atmosphere.

## II.    Mitigation Project 2: Urban Farm Site Development

A.    <u>Implementing Organization</u>: Boston Farms Community Land Trust

B.    <u>Project Funds</u>: $285,000

C.    <u>Description</u>: This Mitigation Project will include the following components:

1.   Boston Farms will acquire and develop an additional parcel of land for urban agriculture. Once developed, this farm site will be made available to one or more community farmers to start or expand their micro-agribusiness. The development process will include identifying the parcel, performing due diligence on the parcel, engaging the community around site usage, creation of designs, and full implementation of site development. Roughly 1500 hours of staff time will be reserved on site development and acquisition. The following sites are being assessed for the next farm development project: 115-123 Bird Street, Roxbury/Dorchester, 53 Ceylon Street, Roxbury, 21-23 Winthrop Street, Roxbury, and 282-284 Washington Street, Dorchester.

2.   Boston Farms will implement infrastructural improvements to the Tommy's Rock farm site located at 1-3 Akron Street in Roxbury. Improvements will include improvements to the greenhouse, irrigation systems, post-harvest handling systems, and plantings in and along the edge of the site.

D.   Projected Air Quality Benefits: The plantings installed on the newly developed urban farm site will remove carbon dioxide from the air and improve overall air quality within the neighborhood. Farmers are encouraged to utilize reduced or no tillage practices to help maintain soil health and organic matter. Both the soil health maintenance and the presence of robust and dense planting throughout the season will increase carbon sequestration by over 25% and reduce overall air pollution by over 45%.

25

The improvements to the greenhouse and irrigation infrastructure will increase the farmer's production values allowing them to provide over 500 plants to neighborhood gardeners and farmers. This increased access to plants further increases the potential of carbon sequestration and reduction of air pollution in neighborhood home gardens.